**Joseph A. DeRENZIS, Plaintiff,**

v.

**Leon LEVY et al., Defendants.**

**No. 67 Civ. 1532.**

United States District Court
S. D. New York.
March 19, 1969.

Mordecai Rosenfeld, Pomerantz, Levy, Haudek & Block, New York City, for plaintiff (Abraham L. Pomerantz, Wm. E. Haudek, New York City, of counsel).

Guggenheimer & Untermyer, New York City, for defendants, Oppenheimer Management Corporation, Oppenheimer & Co., Leon Levy, Jack Nash and Donald W. Spiro (Alfred Berman, New York City, of counsel).

Townsend & Lewis, New York City, for defendants, Oppenheimer Fund, Inc. and Archer Scherl (Edmund T. Delaney, Daniel E. Kirsch, New York City, of counsel).

Valicenti, Leighton, Reid & Pine, New York City, for defendants, Murray Graham and Joseph McDaniel, Jr.

Milbank, Tweed, Hadley & McCloy, New York City, for New York Stock Exchange, amicus curiae (Samuel L. Rosenberry, Wm. E. Jackson, Floyd E. Brandow, Jr., and A. Sidney Holderness, Jr., New York City, of counsel).

Philip A. Loomis, Jr., General Counsel for Securities and Exchange Commission, Walter P. North, Associate General Counsel, Theodore Sonde, Sp. Counsel, Warren K. Morgens, Atty., Washington, D. C., amicus curiae.

FRANKEL, District Judge.

Plaintiff, who owns (with his son) some 56½ shares in defendant Oppenheimer Fund, Inc., brings this derivative action on behalf of the corporation. That nominal defendant is a mutual fund registered under the Investment Company Act of 1940, 15 U.S.C. § 80a—1 *et seq.* The court's jurisdiction is invoked under that statute and under the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.*

The alleged wrongdoers are the defendant directors of the Fund; the defendant Oppenheimer Management Corporation, which has acted, and continues to act, as the Fund's investment adviser; and defendant Oppenheimer & Co., a partnership, which is the Fund's sponsor, which owns about 80% of the Management Corporation's stock, including all of its voting stock, and is a member firm of the New York Stock Exchange as well as other national securities exchanges. The last-named defendant, registered under the Investment Advisers Act of 1940, 15 U.S.C. § 80b—1 *et seq.*, has had a sub-investment advisory contract with the Management Corporation, receiving thereunder 35% of the fees earned by the latter from the Fund.

The complaint alleges a variety of wrongs, including the exaction by the Management Corporation and Oppenheimer & Co. of advisory fees that were "illegal and excessive" in a variety of respects; the charging of these same defendants of "illegal and excessive" underwriting fees; and the receipt by Oppenheimer & Co. of brokerage fees that "were and are excessive and illegal * * *." From among these asserted wrongs the parties have selected one as a subject said to be ripe now for decision as a matter of law. The plaintiff and most of the defendants,[1] by opposed motions for partial summary judgment, pose the question whether the advisory fees paid by the Fund were unlawful because they transgressed a so-called "rule" of the New York Stock Exchange. The issue, arising from facts which are not disputed in any material respect, requires a brief description of the questioned fee arrangement and of the Stock Exchange

---

1. Specifically, the defendants who describe themselves as the "Oppenheimer defendants," namely Oppenheimer Managment Corp., Oppenheimer & Co., and those individual directors and officers of the Fund who are affiliated with Oppenheimer & Co.: Leon Levy, Jack Nash, and Donald W. Spiro. The Oppenheimer Fund and the unaffiliated directors have opposed plaintiff's motion, but have not moved independently for summary judgment.

pronouncement which is said to outlaw it.[2]

During all the times in question,[3] defendant Management Corporation received for its services as the Fund's investment adviser an annual fee equal to the sum of (1) 10% of the Fund's net realized capital gains, diminished by unrealized net loss (i. e., the difference between unrealized gains and losses), and (2) 10% of dividend and interest income. The fee so computed was subject to a maximum limitation (which never became pertinent): it could not exceed 4% of the Fund's year-end net asset value. It appears also that certain Fund salaries and expenses came out of the advisory fees and that effective January 1, 1967, the Management Corporation "voluntarily waived any compensation in excess of 1% of the net asset value of the Fund."[4] Over the years in question, the annual fee ranged from $25,242 (in 1962) to $1,508,226 (in 1967), from a low of .17% of year-end asset value in 1962 to a high of 1.25% in 1964.

In the specific allegations which are of concern on the present motions, paragraph 9(h)(4) of the complaint says this:

"(4) Oppenheimer & Co. is a member of the New York Stock Exchange * * * so that it and its affiliated companies are governed by the Rules of the New York Stock Exchange that regulate member firms and their affiliates and organizations. The advisory fee that is charged the Fund is in violation of a section of Rule 440, which provides in relevant part that the 'fee for investment advisory service may not be based upon the profits realized.' Such Rule governs the fee that Oppenheimer & Co. and Management may charge the Fund by virtue, among other things of §§ 6 and 15A of the Exchange Act."

That reference to "a section of Rule 440," and the language ostensibly quoted therefrom, turns out to generate an annoying problem as to what are fairly to be deemed "rules" of the New York Stock Exchange and which of its recorded utterances, headed "Supplementary Material," may be something other and less than "rules." As will appear, this annoyance might serve to bar summary judgment in plaintiff's favor. But assuming plaintiff's broad definition of "rules" to be correct, the higher authority of Congress defeats plaintiff's contention because it precludes any judicially enforceable restriction like the one plaintiff finds in the quoted declaration of the New York Stock Exchange.

1. In a volume both parties cite and urge the court to consult, New York Stock Exchange, Constitution and Rules (CCH, July 1, 1968), there is a section, at page 3781, headed ¶ 2440 and entitled "Books and Records." Immediately under that title, the following appears:

"Rule 440. Every individual member and every member organization shall make and preserve for at least three years such books and records as the Exchange may prescribe."

---

2. The Securities and Exchange Commission was invited to express its views on the issue before the court. It responded with an *amicus* brief supporting the plaintiff's position. While the court has come to a contrary conclusion, this was accomplished only after the Commission's thoughts had received the attention they merited. And while it might go without saying, the court acknowledges expressly its appreciation for the agency's contribution.

The New York Stock Exchange, having been given leave to do so, filed a brief opposed to the Commission's. This, too, is appreciated. The Exchange argues mainly that its alleged rule, as construed by the Exchange, is not violated by the fee arrangements in question. For reasons developed below, the court does not reach this subject.

3. Specifically, from 1961 through 1967. Effective January 1, 1968, a new fee arrangement was made, and plaintiff makes no complaint about the altered formula or the amounts paid under it.

4. Answer of defendants Oppenheimer & Co. et al., par. 7. In that year, in the absence of the voluntary waiver, the advisory fee would have constituted 1.8% of the Fund's net assets, or $2,757,655.

That sentence, which appears to tender itself as "Rule 440," the numbered rule purportedly invoked by the complaint, is obviously not relevant to our problem.

Proceeding onward in the book, we come to a subheading (still on page 3781), "Supplementary Material," followed by a page or so of directions to members having equally little to do with present concerns. Then, at page 3781–3, under a new paragraph heading, "¶ 2440A —Statistical and Investment Advisory Services," toward the end of another page subheaded "Supplementary Material," there appears the sentence plaintiff invokes:

> "The fee for investment advisory service may be based on a percentage of the principal amount of the funds involved but may not be based upon the profits realized."

That is unquestionably language directive in nature and relevant to our subject. It is at a far physical remove, however, from the nearest preceding pronouncement labelled a "rule." It is under a separate, different, seemingly coordinate heading following the one under which plaintiff purported to cite the authoritative rule and number asserted to have force and effect as federally enforceable law.

All this about typography, locus in a book, and numeration has, to be sure, a paltry and unedifying sound. At least it seemed so on first hearing to one listener. A little reflection, however, makes a difference. In addition to its more inspiring qualities, and prior to them, the "law" should be as visible, identifiable, and certain as we can contrive to make it. It should not, for instance, be "written in print too fine to read * * *." Lambert v. California, 355 U.S. 225, 230, 78 S.Ct. 240, 244, 2 L.Ed. 2d 228 (1957). Cf. Silvestri v. Italia Societa Per Azioni Di Navigazione, 388 F.2d 11 (2d Cir. 1968). Assuming plaintiff's answer to the hard question whether stock exchange rules may ever give rise to rights like that asserted here, this could only be true if, at a minimum, the propositions in question were promulgated, recorded, and known as rules—or, at least, something closely approximating rules. The motion papers lack any certain assurance on this score. And so, if the pertinent materials led in other respects to plaintiff's conclusion, this subject would require further exploration.

It turns out, however, that defendants must prevail even if it is assumed that the sentence plaintiff invokes is a full-fledged "rule" in every relevant sense. Accordingly, plaintiff's position on this subject is accepted *arguendo* for purposes of the discussion and conclusion which follow.

2. One further by-pass in the way of a broad *arguendo* will bring us to the point on which the court finds plaintiff's position to founder. Plaintiff advances the decision in Colonial Realty Corporation v. Bache & Co., 358 F.2d 178 (2d Cir. 1966), as "the leading authority defining, for this Circuit, the extent to which violations of a stock exchange rule give rise to a federally-based implied right of action." We may put aside relatively quickly the thought that the pronouncements plaintiff cites, though obviously careful and scarcely obiter, were dicta.[5] We might pause at greater length

---

5. The absence of an actual holding for plaintiff's position, in *Colonial Realty* or elsewhere, does suggest that we should tarry at least for a *caveat* prompted by the peculiar circumstances of the present case. Apart from matters of format and labelling such as those mentioned earlier on the problem of whether we have a genuine "rule" in this case at all, there are potentially troublesome questions as to the constituency and the procedures which give birth to exchange rules. The

Administrative Procedure Act § 4, 5 U.S.C. § 553 (1967), and the Federal Register Act, 44 U.S.C. § 301 *et seq.* (Supp.1968)—the latter, at least, recalling some quasi-comic episodes that amused none of the participants, see Panama Refining Co. v. Ryan, 293 U.S. 388, 412–413, 55 S.Ct. 241, 79 L.Ed. 446 (1935); Jackson, The Struggle for Judicial Supremacy 89–91 (1941)—stand among many reminders that even public officials making "legislative" enactments

over the appellate court's observation that a "party urging the implication of a federal liability [carries] a considerably heavier burden of persuasion than when the violation is of the statute or an SEC regulation." *Id.* at 182. And we would want to find, or be able to construct, a demonstration far more vivid than the one plaintiff sketches to conclude that the case at hand is fairly to be viewed as one where the "stock exchange rule" seems designed to "play an integral part in SEC regulation * * *." *Id.* at 182.

Passing all that, we proceed to what the court has come to perceive as a narrow but convincing ground of decision. Assuming the area is one in which an exchange rule *could* operate with the force of law, this would at best be true only of a valid and authorized rule supposedly within the "legislative" authority of the exchange. More pointedly, it could not be true of a rule found to be at war with the governing federal statutes. And that, finally, is the plainest vice in plaintiff's theory.

3. When the alleged rule plaintiff invokes was adopted in 1939, the SEC was in the closing stages of a four-year study pursuant to § 30 of the Public Utility Holding Company Act, 15 U.S.C. § 79z–4 (1963). That study led in 1940 to the simultaneous enactment of the Investment Company Act and the Investment Advisers Act. See S. E. C. v. Capital Gains Bureau, 375 U.S. 180, 187, 189, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963). The two statutes, closely interrelated at many points of present interest, impose a pattern of "detailed regulation" upon investment advisers. O'Neill v. Maytag, 339 F.2d 764, 769 (2d Cir. 1964). They repeatedly single out for special treatment—either specially restrictive or permissive—the relationship between an investment adviser and an investment company, as distinguished from other clients of advisers. See, in the Investment Company Act, 15 U.S.C. §§ 80a—2(a) (19), 80a—9(a), 80a—10(a), (d), and (f), 80a—15(a) and (c), 80a—17(i), 80a—27(a) (5), and, in the Investment Advisers Act, 15 U.S.C. §§ 80b—3(b) (2), 80b—4, 80b—5. If there were no more than this fairly comprehensive scheme, it might be argued that the national legislation had "occupied the field" and superseded (at least by omission) the earlier stock exchange rule upon which plaintiff relies.

But there is more powerful and positive refutation of plaintiff's view. The Investment Company Act and the Investment Advisers Act—originally introduced and eventually passed as Title I and Title II, respectively, of a single enactment [6]—would both have served, as they were first presented, to achieve the result for which plaintiff contends. In the course of the legislative process—marked by detailed consultations among the SEC, the regulated interests, and congressional personnel—provisions which would have had that effect were deleted or altered in what are now vitally significant respects. In the end, as plaintiff acknowledges, neither Act forbids the kind of adviser's fee here in question. And this is not the consequence of an innocuous omission in the sense of a point overlooked or never reached. See Western Union

of any public consequence should be bound to at least minimal standards of notice and an opportunity for people affected to be "heard" in some rudimentary way. Cf. Fuchs, Procedure in Administrative Rule-Making, 52 Harv.L. Rev. 259, 271–72, 274–76 (1938). This is not a concern, of course, when the promulgating exchange itself is being called upon to obey or enforce its own rules and regulations. Baird v. Franklin, 141 F.2d 238 (2d Cir.), cert. denied, 323 U.S. 737, 65 S.Ct. 38, 89 L.Ed. 591

(1944). The problem becomes more troublesome, however, when it is proposed that such rules should define valuable rights and costly liabilities for members of the exchange and people dealing with them. The subject would seem, at any rate, to merit some particular attention before actually holding that a particular rule should be given the force of federal "law" creating private rights of action.

6. Pub.L. No. 768, 76th Cong., 3d Sess., 54 Stat. 789 (1940).

Tel. Co. v. Lenroot, 323 U.S. 490, 498–499, 501, 65 S.Ct. 335, 89 L.Ed. 414 (1945). It results, rather, from the particular and specific deletion by Congress of the very prohibition plaintiff would now read as an item of federally enforceable "law" because it is said to be a New York Stock Exchange rule. There are decisive reasons in precedent and reason for rejecting such an effort to "supply what Congress has studiously omitted." F.T.C. v. Simplicity Pattern Co., 360 U.S. 55, 67, 79 S.Ct. 1005, 1012, 3 L.Ed. 2d 1079 (1959).

As originally proposed, both Titles of the 1940 Act contained provisions sustaining plaintiff's present position. The more general and less sharply focussed for our purposes was a section of Title I, the Investment Company Act, which would have required that the compensation of an investment adviser to a registered investment company be

"determined on one or more of the following bases and no other:

(1) a definite sum of money per year, month, or other definite period;

(2) a sum of money representing a definite percentage of such company's income from interest and dividends during a definite period; or

(3) a sum of money representing a definite percentage of the value of the net assets of such company as of a definite date or averaged over a definite period." S. 3580, 76th Cong., 3d Sess., tit. I, § 15(a) (1940).

The SEC sought in this provision to "kill profit-sharing arrangements * * *." [7]

The extensive industry criticisms of the original bill included attacks on § 15(a) as an unjustified measure to "dictate the basis of management compensation * * *." [8] The compromise produced from the ensuing negotiations and revisions, see 1 Loss, Securities Regulation 147 (2d ed. 1961), was a statute from which the quoted restrictions had been excised.[9]

Even more exactly like the Stock Exchange rule to which plaintiff would give the status of federal law was the original version of what became § 205 of the Investment Advisers Act, 15 U.S.C. § 80b—5 (1963). As it still does today, the original of that section forbade any registered investment adviser to enter into or perform any "investment advisory contract" which provided

"for compensation to the investment adviser on the basis of a share of capital gains upon or capital appreciation of the funds or any portion of the funds of the client * * *." S. 3580, supra, tit. II, § 205.

Standing alone, that language was (and remains) a very substantial counterpart of the Stock Exchange rule here in question. And in the original bill there were no limitations of any kind now pertinent upon the sweep of the quoted prohibition. Again, however, the legislative process produced a revision which is squarely pertinent and critically important today. Unlike the original, § 205 as enacted provided, as it still provides, that the "investment advisory contracts" to which the quoted limitation (and others) should apply "means any contract or agreement whereby a person agrees to act as investment adviser or to man-

7. Hearings Before a Subcommittee of the Senate Committee on Banking and Currency on S. 3580, 76th Cong., 3d Sess., pt. 1, at 252 (1940).

8. Senate Hearings, pt. 2, at 1055; id. at 372.

9. Following the Senate hearings, the SEC and the investment companies "sat down together, and * * * agreed upon * * * terms and provisions." 86 Cong.Rec. 10071 (1940) (Senator Wag-ner, the bill's sponsor). In connection with the provision under discussion, § 15(a), the SEC reported: "The Commission recommends, but does not insist, that certain types of profit-sharing contracts be outlawed." Hearings on H.R. 10065 Before a Subcommittee of the House Committee on Interstate and Foreign Commerce, 76th Cong., 3d Sess. 96 (1940). This recommendation was apparently overridden by industry pressure for the contrary view which prevailed in the statute as enacted.

age any investment or trading account *for a person other than an investment company."* (Emphasis added.)

In short, to labor the point only a little more, Congress explicitly exempted advisory contracts like the one before us from the precise form of rule plaintiff would have applied under the authority of the New York Stock Exchange. What is asserted is a kind of power of legislative revision which neither the SEC nor the courts nor a stock exchange may successfully assert against the paramount determination of the Congress. It is perfectly plain that the statutory exemption of investment company contracts "reflects a deliberate choice, rather than an inadvertent omission." United States v. Muniz, 374 U.S. 150, 156, 83 S.Ct. 1850, 1855, 10 L.Ed.2d 805 (1963). "If the Act is to be altered that is a function for the same body that adopted it." Rayonier, Inc. v. United States, 352 U.S. 315, 320, 77 S.Ct. 374, 377, 1 L.Ed. 2d 354 (1957); see also Blau v. Lehman, 368 U.S. 403, 411–412, 82 S.Ct. 451, 7 L.Ed.2d 403 (1962); Fleischmann Distilling Corp. v. Maier Brewing, 386 U.S. 714, 721, 87 S.Ct. 1404, 18 L.Ed.2d 475 (1967); American Commercial Lines v. L. & N. R. Co., 392 U.S. 571, 589–590, 88 S.Ct. 2105, 20 L.Ed.2d 1289 (1968).

The SEC has lately concluded that the exemption for investment company contracts is not desirable. It has, accordingly, submitted to "the same body that adopted it" a proposed amendment of the statute.[10] Cf. Blau v. Lehman, *supra*, 368 U.S. at 413, 82 S.Ct. 451. Thus far at least, Congress has not followed the suggestion. The amendment may not be achieved, as plaintiff (and now the Commission as *amicus*) would achieve it, by virtue of a stock exchange rule.[11]

For the foregoing reasons, plaintiff's motion is denied and defendants' is granted. Paragraph 9(h) (4) of the complaint is stricken.

It is so ordered.

10. Report of the Securities and Exchange Commission on the Public Policy Implications of Investment Company Growth, H.R.Rep. No. 2337, 89th Cong., 2d Sess. 344–45 (1966).

11. In its *amicus* brief the Commission reports (p. 12 n. 19) its proposal of the above-described amendments both to the 90th Congress and to the present Congress. Even that recommendation, thus far not accepted, was modified during hearings in the 90th Congress so that it would have stopped short of the unqualified stock exchange rule here in question. See Hearings on H.R. 9510 and H.R. 9511 Before the Subcommittee on Commerce and Finance of the Committee on Interstate and Foreign Commerce, 90th Cong., 1st Sess., pt. 1, at 79 (1967). Apart from that interesting intelligence, the Commission is remarkably silent concerning the import of its legislative efforts. There is no suggestion by the agency as to why it has importuned two Congresses to write amendatory legislation for a purpose already accomplished (according to the Commission as *amicus*) by the stock exchange rule. The Commission does not even intimate, though perhaps the court should infer, an attempted explanation in terms of possibly over-abundant caution. Whatever the omitted explanation might be thought to be, the court finds the Commission's submissions to Congress, in their full context, persuasive against its submissions as *amicus* here.

The full context includes, among other things the parties cite, the Commission's blandly factual report to Congress in 1966 that fee arrangements like those now questioned were known in the industry—with never a suggestion of doubt as to their legality. In Report of the Securities and Exchange Commission on the Public Policy Implications of Investment Company Growth, H.R.Rep. No. 2337, 89th Cong., 2d Sess. 90 (1966) the Commission said simply:

"Some funds have advisory contracts which specifically relate the advisory fee to the fund's investment performance. In most of these instances, the adviser's fee is based on a percentage of both investment income and net capital gains. In a few instances it is based entirely on investment income. Performance-based fee arrangements, like those based on a percentage of assets, provide strong incentives for increasing fund size through sales of shares. The larger the size of the assets managed, the greater the potential for increasing the dollar amount of the fund's income and capital gains and hence the amount of the advisory fee." (Footnotes omitted.)