**TEXACO PUERTO RICO, INC.; Shell Company (Puerto Rico) Limited, and Esso Standard Oil Co. (PR), Plaintiffs,**

v.

**Jorge OCASIO RODRIGUEZ, et al., Defendants.**

**Civ. Nos. 89–1142 (JAF), 89–1143 (JAF) and 89–1144 (JAF).**

United States District Court, D. Puerto Rico.

Oct. 3, 1990.

William Estrella, San Juan, P.R., for Texaco.

Samuel T. Céspedes, McConnell Valdes Kelley Sifre Griggs & Ruiz–Suria, San Juan, P.R., for Shell.

Jaime Sifre, Sanchez–Betances & Sifre, San Juan, P.R., for Esso.

Jorge Pérez–Díaz, Sol. Gen., Com. of Puerto Rico, San Juan, P.R., Lynn R. Coleman, Mathew W.S. Estes, Washington, D.C., for defendants.

## OPINION AND ORDER

FUSTE, District Judge.

The plaintiffs in these consolidated cases are three corporations engaged in the gasoline wholesaling business in Puerto Rico. They brought this suit pursuant to 42 U.S.C. section 1983 contesting the regulation of wholesale gasoline prices by Puerto Rico's Department of Consumer Affairs ("DACO"). The case is submitted on cross-motions for summary judgment. We dispose of all pending motions herein.[1]

---

1. This opinion is being entered in lieu of the opinion and orders dated June 15, 1990 and

## I. *General Background*

### A. Prior Litigation

This action is but the latest episode in an ongoing saga matching gasoline wholesalers in Puerto Rico against DACO. We presently revisit only the highlights of prior installments. Anyone thirsting for the unabridged version of this drama is referred to the following related decisions: *Puerto Rico Dep't of Consumer Affairs v. Isla Petroleum Corp.*, 485 U.S. 495, 108 S.Ct. 1350, 99 L.Ed.2d 582 (1988); *Tenoco Oil Co. v. Department of Consumer Affairs*, 876 F.2d 1013 (1st Cir.1989); *Isla Petroleum Corp. v. Puerto Rico Dep't of Consumer Affairs*, 811 F.2d 1511 (TECA 1986); *Isla Petroleum Corp. v. Dept. of Consumer Affairs*, 640 F.Supp. 474 (D.P.R.1986).

From 1973 to 1981, gasoline prices in the United States and in Puerto Rico were regulated by the federal government. Due to the active federal role, Puerto Rico and the States were preempted from adopting their own price controls. The federal price controls took the form of a limitation on the "gross profit margin" obtained from gasoline sales. "Gross profit margin" refers to the difference between a seller's sales price and the seller's "acquisition cost." "Acquisition cost" under the federal scheme included the price the seller paid for gasoline plus excise taxes, but did not include the seller's transportation costs and other operating costs. At the time gasoline prices were deregulated in 1981, the wholesale gross profit margin set by the federal government was 8.6 cents per gallon.

Although given authority to act under Puerto Rico law, DACO did not immediately step in when the federal government got out of the price setting business in 1981.[2] Instead, from 1981 through 1985, DACO

and the wholesalers informally agreed that gross margins could stay within levels formerly existing under federal law. This state of affairs prevailed until the first quarter of 1986, at which time the wholesalers, taking advantage of a drop in world oil prices, managed to achieve gross profit margins greater than 8.6 cents. In March 1986, concluding that gasoline prices on the island were too high, the Puerto Rico Legislature increased an already existing excise tax on gasoline in order to recoup part of the oil companies' "excessive profits." At the same time, DACO issued a series of orders pursuant to its power under Price Regulation 45 forbidding wholesalers from passing the new tax through to retailers and freezing wholesale and retail prices at their March 31, 1986 levels.

These orders were resisted by most if not all wholesalers, sparking various administrative skirmishes. By May 1986 these skirmishes escalated into war when world oil prices *increased* and the wholesalers, their prices frozen, were forced to sell gasoline *below* acquisition cost. Eight wholesalers filed complaints in federal district court in Puerto Rico seeking relief from DACO's regulations, which they claimed violated the due process and takings clauses of the federal constitution, as well as local law. This court consolidated the eight actions and immediately scheduled a hearing.

On May 20, 1986, just before trial, DACO revised its previous regulations by issuing an entirely new order. This order divided gasoline wholesalers into two groups, established an 8.6 cent per gallon profit margin for one group and a 3.6 cent margin for the other, allowed members of the 3.6 cent group to petition for special relief, and required DACO's Secretary to grant a hearing within five days of such a petition.[3] At the pretrial conference, this court

---

June 26, 1990 which were withdrawn July 2, 1990.

**2.** DACO is generally empowered by Puerto Rico law to regulate the prices and profit margins of goods and services in order to protect consumers' rights and restrain inflation. 3 L.P.R.A. § 341b (1982). In 1975, pursuant to its authority under 3 L.P.R.A. §§ 341–341v, DACO promulgated Price Regulation 45, which authorized

DACO's Secretary to regulate the prices and maximum margins of benefits of gasoline and other fuel commodities. Price Regulation 45 was later amended so as to not take effect until the federal regulations ended.

**3.** The First Circuit summarized the new order as follows:

deemed the complaints amended so that the focus of plaintiffs' attack now fell on the new order. After a three-day trial on the merits, the court: (1) rejected DACO's contention that it should abstain from adjudicating plaintiffs' claims; (2) held that the price regulations adopted in the new order were violative of the due process and takings clauses of the United States Constitution; and (3) held that DACO's regulation was preempted by a federal policy favoring deregulation of gasoline prices. *See Isla Petroleum Corp. v. Department of Consumer Affairs*, 640 F.Supp. 474 (D.P.R. 1986). In accordance with the above, the court issued a permanent injunction invalidating DACO's gasoline price regulations.

A dicotyledon appellate process followed, with one stalk shooting up to the Temporary Emergency Court of Appeals ("TECA") and another to the First Circuit. The appeal to TECA concerned only the question of whether a federal policy favoring deregulation preempted DACO's power to regulate gasoline prices. TECA affirmed that it did in *Isla Petroleum Corp. v. Puerto Rico Dep't of Consumer Affairs*, 811 F.2d 1511 (TECA 1986). On certiorari, however, the Supreme Court reversed both TECA and the district court, unanimously holding that Puerto Rico's authority to control gasoline prices was not preempted by any federal policy. *Puerto Rico Department of Consumer Affairs v. Isla Petroleum Corp.*, 485 U.S. 495, 108 S.Ct. 1350, 99 L.Ed.2d 582 (1988).

At this point the First Circuit, which had stayed its hand until the Supreme Court disposed of the preemption question, entertained DACO's appeal of the due process and takings clause issues. In *Tenoco Oil Co. v. Dept. of Consumer Affairs*, 876 F.2d 1013 (1st Cir.1989), the circuit's first step was to disentangle what it found to be this court's improper amalgamation of substantive due process and takings clause analyses. *Id.* at 1020–21. Under the substantive due process heading the court limited its analysis to whether the establishment of maximum gross profit margins for gasoline was rationally related to a legitimate governmental objective. *Id.* at 1021, citing *Nebbia v. New York*, 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940 (1934). The court concluded that the May 20 order met this standard, finding, first, that it is "beyond dispute that Puerto Rico may legitimately regulate the prices of staples like gasoline," and, second, that DACO's method of regulation—using maximum gross profit margins—was rationally related to this end. *Id.* at 1022. Thus, the court "perceive[d] no due process problem." *Id.* at 1021.

The court then turned to the adequacy and fairness of the 3.6 and 8.6 cent margins imposed by DACO, addressing this issue under the rubric of takings clause analysis.[4] Under this analysis, the court observed, "plaintiffs may not constitutionally be subjected to controls which depress the prices they may charge below just and

The new May 20 price order divided gasoline wholesalers into two classes: those which in DACO's view had obtained profits in excess of 8.6 cents per gallon during the first quarter of 1986, and those smaller wholesalers ... which had not. The order established a gross profit margin limit for the first group of 3.6 cents per gallon, and for the second group of 8.6 cents per gallon. Companies limited to 3.6 cents per gallon were allowed to petition for membership in the 8.6 cents group, upon a showing that the company had attained an average gross profit margin of 8.6 cents for the 1986 calendar year, taking into account the company's supposedly inflated first quarter gross profit margins. The order allowed gasoline retailers a 17.7 cents per gallon gross profit margin. Any company adversely affected by the order was permitted to file a request to the Secretary for special relief from the order. The order provided that the Secretary would hold a hearing on any re-

quest for special relief within five days of receiving the request. The order also scheduled for June 2, 1986 a public hearing before the Secretary. The stated purpose of the hearing was "to receive comments from all interested persons on the adequacy of this Temporary Order and on any modifications that should be made to attain a situation where primary reliance can be placed on competitive market forces to maintain fair margins at all levels of distribution and fair prices for the consumer."

*Tenoco Oil Co. v. Dept. of Consumer Affairs*, 876 F.2d 1013, 1018 (1st Cir.1989) (footnotes omitted).

4. As mentioned above, the First Circuit found that this court improperly merged substantive due process analysis with takings clause analysis. The court in *Tenoco* opined that under substantive due process the court need only apply the "rational basis test" and that consider-

reasonable levels, at least in the absence of an adequate remedy under Puerto Rico law to secure to them just compensation for the 'taking' which such a regulation would impose." *Id.* at 1023, *citing Duquesne Light Co. v. Barasch,* 488 U.S. 299, 109 S.Ct. 609, 615–16, 102 L.Ed.2d 646 (1989). The First Circuit did not apply this standard to the case before it, however, noting that a takings claim "is not ripe until the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue." *Id.* at 1024, *quoting Williamson Planning Commission v. Hamilton Bank,* 473 U.S. 172, 186, 105 S.Ct. 3108, 3116, 87 L.Ed.2d 126 (1985). Because the disputed order, which was entitled "Temporary Order," expressly contemplated further administrative adjustments and review procedures, and because the court found that "DACO had not yet definitively limited plaintiffs to a specified gross profit margin," *Id.* at 1026, the First Circuit held that judicial intervention was premature—"that given the opportunity for almost immediate administrative review, the May 20, 1986 price order did not yet amount to a taking and was not yet ripe for constitutional adjudication." *Id.* at 1028. Thus, the injunction invalidating the price order was vacated and the controversy brought to a close—for the time being.

B. Post–Tenoco Developments: The Present Controversy

1. *The "Interim Order"*

Shortly after *Tenoco* was handed down, DACO again set about stoking the regula-

tory furnace. On June 27, 1989, DACO issued an "Interim Order," effective immediately, whereby gasoline wholesalers were limited to an 11 cent gross profit margin over their acquisition costs. (This time "acquisition cost" was defined as the price paid to the supplier plus applicable excise taxes *and* transportation costs.) The Interim Order also announced that DACO would conduct a rulemaking proceeding on August 7 to consider (a) whether it should continue to regulate gasoline prices; (b) what form that regulation should take; and (c) whether it should require wholesalers to refund amounts charged in excess of DACO's previous regulations for a time period beginning January 1, 1986. DACO further stated that wholesalers disadvantaged by the Interim Order could petition for special relief from the established price margins. The Interim Order did not, however, establish a time frame for DACO to hold a hearing on a special relief petition.

The Interim Order was immediately attacked by three of the four large, "high cost" gasoline wholesalers operating in Puerto Rico, namely Esso, Shell and Texaco.[5] This attack advanced concurrently on a number of fronts. At the administrative level, Esso, Shell and Texaco each filed motions for special relief from the 11 cent margin. Also at the administrative level, Esso, Shell and Texaco participated in DACO's August 7 rulemaking proceeding wherein they voiced objections to *any* state regulation of the gasoline industry and to

ations of the fairness of the profit margins established by DACO—considered by this court as part of its due process analysis—are more appropriately addressed under the heading of the takings clause. While the First Circuit conceded that under some circumstances "a deficiency in the allowed rates might ... implicate the due process clause," *see, e.g., Mora v. Mejías,* 223 F.2d 814 (1st Cir.1955) (regulation requiring dealers to sell rice below cost violates due process), it noted that "recent cases from the Supreme Court seem to suggest a strong preference for a takings [and not a due process] analysis in such a situation." *Tenoco,* 876 F.2d at 1023.

**5.** The gasoline wholesaling market in Puerto Rico is shared by four large wholesalers (Esso,

Shell, Texaco and CAPECO) and roughly an equal number of smaller, independent distributors. In the case at hand, it is the large wholesalers—as opposed to the independents—who are objecting to the setting of gross profit margins. This is so, presumably, because the setting of gross profit margins more severely impacts companies with high operational costs than smaller, more efficient companies. Because gross profit margins do not take into account a wholesaler's operating costs—other than those costs associated with purchasing and transporting gasoline, plus excise taxes—the amount a wholesaler actually makes as net profit depends on the efficiency of its operations. CAPECO, the Caribbean Petroleum Company, purchased assets formerly owned by GULF.

DACO's proposal that they disgorge allegedly excessive profits. With regard to both the special relief and rulemaking proceedings, Esso, Shell and Texaco each submitted extensive economic data concerning their investments, assets, prices, and business expenses. Furthermore, each company submitted for DACO's consideration economic studies purporting to demonstrate the competitiveness of the wholesale market in Puerto Rico and adverse effects of regulating gasoline prices.

While these matters were pending before DACO, Esso, Shell and Texaco filed separate lawsuits in the Superior Court of Puerto Rico, challenging the regulations under Puerto Rico statutory and constitutional law.[6] At the same time, these oil companies also filed separate complaints in federal court alleging that the Interim Order violated the due process and takings clauses of the federal constitution. However, because the Interim Order called only for a temporary regulation of gasoline prices, and contemplated further administrative proceedings, this court dismissed the complaints as premature under the doctrine established in *Tenoco*.

### 2. At Issue: The "Final Order"

On November 30, 1989, pursuant to a stipulation in the local court action, DACO produced a "Final Order" which purports to be DACO's last word on the rulemaking proceedings and on plaintiffs' special relief petitions. This is the subject of the present litigation.[7] Briefly summarized, the Final Order, which runs over one-hundred pages in translation, discusses the thirty-year history of gasoline price regulation in Puerto Rico; reaffirms the need to continue regulating gasoline prices; finds that gasoline is a staple good the price of which has an important impact on the public; finds that a lack of competition in Puerto Rico's gasoline wholesale industry made the marketplace an inadequate substitute for regulation; concludes that gross wholesale profit margins are an appropriate way of regulating gasoline prices; outlines DACO's methodology for determining reasonable wholesale margins; responds to various criticisms of this methodology, as well as criticisms of some of DACO's calculations; and establishes a gross wholesale profit margin of 13 cents per gallon over operational costs, including transportation costs and taxes.

Shortly after the Final Order was issued, this court, on plaintiffs' motion, reopened the case, finding that *Tenoco*'s finality requirement was now met. The complaints, as amended to attack the Final Order, basically make two arguments. First, plaintiffs claim that DACO's decision to regulate wholesale gasoline prices is violative of substantive due process principles in that DACO's finding concerning a lack of competition in the industry is arbitrary, capricious, and not based on substantial evidence in the administrative record. Second, plaintiffs argue that the 13 cent per gallon gross profit margin is so low as to constitute a taking without just compensation in violation of the fifth amendment. In so arguing, the wholesalers attack numerous calculations made by DACO in arriving at the 13 cent rate, all of which—according to plaintiffs—artificially inflate the wholesalers' profits under a 13 cent rate. Plaintiffs would substitute these calculations with their own calculations which allegedly demonstrate that a 13 cent per

---

**6.** As explained in plaintiffs' briefs, the local suits were protective in nature insofar as plaintiffs believed that because DACO had not resolved the special relief petitions within thirty days, the same were effectively denied and thus plaintiffs' only recourse was to seek judicial review. *See* 3 L.P.R.A. §§ 341*o* and p.

**7.** The "Final Order" came about as the result of a stipulation entered into between DACO and the oil companies in the Superior Court action. One issue pending before the Superior Court was plaintiffs' contention that, because of the length of time that had passed, DACO's "Interim Order" had in effect become a final decision. *See Tenoco*, 876 F.2d at 1026–27 (noting that "the reasonableness of a procedure for seeking exemption from or alteration of a regulation which may temporarily confiscate property will depend upon the nature of the regulation, the length of delay and the impact on a citizen of the challenged order"). Before the Superior Court could pass on this matter, the parties stipulated that by November 30, 1989, DACO would issue a final, judicially reviewable decision on the rulemaking issues and the special relief petitions.

gallon rate does not afford them a reasonable return.[8]

The case is now submitted on cross-motions for summary judgment. Because the court finds that the parties agree on the material facts of the case—disputing only their legal significance—the action may properly be disposed on motion.[9] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Lipsett v. University of Puerto Rico*, 864 F.2d 881 (1st Cir.1988).[10]

## II. *Due Process*

■ Plaintiffs' substantive due process claim need not contain us long, as this, we feel, was ably swatted down by the First Circuit in *Tenoco*. There, faced with a virtually identical due process challenge, the First Circuit applied the "rational basis test," observing that

> [t]he burden of proving the irrationality necessary to sustain a due process challenge rests on the party asserting the violation, in this case the plaintiff oil companies. *See National Railroad Passenger Corp. v. Atchison, Topeka & Santa Fe Railway Co.*, 470 U.S. 451, 477, 105 S.Ct. 1441, 1457, 84 L.Ed.2d 432 (1985) (citing *Pension Benefit Guaranty Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 729, 104 S.Ct. 2709, 2717–18, 81 L.Ed.2d 601 (1984)). The burden of establishing

such unreasonableness as to deny due process of law is not easily met. For the last half-century, courts have upheld challenged governmental acts unless no reasonably *conceivable* set of facts could establish a rational relationship between the regulation and the government's legitimate ends. *See Williamson v. Lee Optical Co.*, 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955).

*Tenoco*, 876 F.2d at 1022 n. 15 (emphasis in original).

Applying this standard, the court found that the oil companies had not carried their burden. With respect to the existence of a legitimate governmental end, the court found it "beyond dispute that Puerto Rico may legitimately regulate the prices of staples like gasoline if it thinks that the public interest requires." *Id.* at 1022, *citing Pennell v. City of San José*, 485 U.S. 1, 11, 108 S.Ct. 849, 857, 99 L.Ed.2d 1 (1988).[11] Likewise, the court found that "[r]ational people could have thought (whether or not wisely is beyond our purview) that wholesaler price controls were a desirable way to protect ultimate consumers by keeping retailer acquisition costs down." *Id.* at 1021–22. DACO's method of regulation—using a maximum gross profit margin—was found to be "not unreasonable" in that it "eliminates elaborate reporting and ac-

---

**8.** Plaintiffs have also contested DACO's plan to petition for restitution of excess profits. In a previous order, however, the court found that these claims were not ripe for adjudication at this time. *See* Docket Document No. 120. The restitution issue is therefore not addressed herein.

**9.** Shell's argument that the dispute as to its "inefficiency" precludes summary judgment is taken up in Section (E)(4), *infra*.

**10.** Also pending is defendants' motion asking the court to reconsider its refusal to abstain from exercising jurisdiction over this case. That motion is now DENIED. The court's reasons for refusing to abstain are set forth in its opinion in *Isla Petroleum Corp. v. Dept. of Consumer Affairs*, 640 F.Supp. at 500. That decision was endorsed by the First Circuit in *Tenoco. See* 876 F.2d at 1029 n. 23. Indeed, the entire opinion in *Tenoco* presupposes that this court may eventually have to rule upon the matters presently at hand. Defendants have failed to convince the court that its previous view was mistaken or that the present action

raises abstention-related concerns absent in the prior litigation. This case remains a due process and takings clause attack against a state administrative body's price setting regulations. The rules of decision are entirely federal, the case raises no unresolved issue of local law, nor is there a threat of undue interference with the local administrative process. Furthermore, this court has gained considerable familiarity with the issues of this case. In short, "[o]nly the clearest of justifications will warrant dismissal," *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 819, 96 S.Ct. 1236, 1247, 47 L.Ed.2d 483 (1976), and no such justification is present in the case at hand.

**11.** *See also In re Permian Basin Area Rate Cases*, 390 U.S. 747, 768, 88 S.Ct. 1344, 1360, 20 L.Ed.2d 312 (1968) ("A legislative power to create price ceilings has, in countries where the common law prevails, been customary from time immemorial....") (quoting *Munn v. Illinois*, 94 U.S. 113, 133, 24 L.Ed. 77 (1876)).

counting of operating costs *and* encourages companies to keep down their operating costs." *Id.* at 1022. In short, the First Circuit perceived "no due process problem" in DACO's choosing to regulate gasoline prices through the imposition of wholesale profit margins. *Id.* at 1021.[12]

Plaintiffs in the case at hand understandably ignore the entire section of *Tenoco* devoted to substantive due process. Instead, plaintiffs argue that DACO's decision to regulate was arbitrary and irrational insofar as it was based on an allegedly insupportable finding that the wholesale gasoline industry in Puerto Rico was uncompetitive. Plaintiffs point to this court's finding in its 1986 *Isla Petroleum* opinion that the gasoline wholesale market in Puerto Rico was "vigorously competitive." In addition, plaintiffs harshly criticize an economic study relied upon by DACO showing a lack of competition at the wholesale level and submit their own experts' studies which allegedly prove the wholesale industry is highly competitive.

Plaintiffs' attempt to prove the competitive nature of the wholesale industry is insufficient to throw off the yoke of *Tenoco*'s due process holding or to carry the heavy burden imposed by the rational basis test.[13] In the first place, we note that DACO does not base its decision to regulate entirely on a finding of a lack of competition. For instance, DACO also determined that gasoline is a staple good the price of which has an important impact on the public. Final Order at 12. This finding, which is uncontested by plaintiffs, is probably sufficient by itself to pass muster under rational basis analysis. *Tenoco*, 876 F.2d at 1022 ("It is beyond dispute that Puerto Rico may legitimately regulate the prices of staples like gasoline if it thinks that the public interest requires"). Similarly, plaintiffs' attack on DACO's finding concerning a lack of competition is not so forceful so as to overcome the deference afforded to such a determination under the rational basis test. Under rational basis analysis, the court will not "sit as a super legislature to weigh the wisdom of legislation." *Id.* at 1021, *quoting Ferguson v. Skrupa*, 372 U.S. 726, 731, 83 S.Ct. 1028, 1031, 10 L.Ed.2d 93 (1963). Rather, an economic regulation will be upheld if, "under any conceivable set of facts," it is rationally related to a legitimate governmental purpose. The court has carefully examined the respective economic studies concerning the competitive nature of the wholesale market in Puerto Rico and finds some of plaintiffs' arguments to be forceful. Even so, the court cannot conclude that DACO has absolutely no basis in fact for concluding to the contrary.[14] Indeed,

---

**12.** The *Tenoco* court's comments on the due process issue did not consider the fairness or adequacy of the established price margins themselves, finding that this issue is better addressed under the takings clause rather than the due process clause. *Id.* at 1022, *citing Duquesne Light Co. v. Barasch*, 488 U.S. 299, 109 S.Ct. 609, 615–16, 102 L.Ed.2d 646 (1989).

**13.** To the extent that plaintiffs rely on this court's 1986 finding in *Isla Petroleum* that the wholesaling industry on the island was "vigorously competitive," that finding was surely superseded by the First Circuit's blanket rejection of a substantive due process claim in *Tenoco*. We might ask plaintiffs why, in light of *Tenoco*'s guidance, they think a further finding by this court regarding industry competitiveness would fare any better.

**14.** In the Final Order DACO made the several findings which lend support to its decision to regulate: (1) gasoline is an important public good whose regulation is in the public interest; (2) each of the four largest wholesalers in Puerto Rico has over twice the market share of the largest company in the United States; (3) the combined market share of the four largest wholesalers is 10 and 20 percentage points higher than the market shares in the two highest concentrated states in the United States; (4) the market share of the four largest wholesalers increased from 73.4% to 81.5% from 1980 to 1988; (5) market concentration, as measured by the Herfindahl Index, has increased significantly since 1986; (6) there are significant barriers to entry and only small local wholesalers with little market share have entered the market since 1980, other than through the acquisition of existing businesses; (7) large wholesalers have not significantly reduced their margins since DACO was enjoined in 1986, despite claims of increased competition; and (8) margins in the United States are lower than margins in Puerto Rico. While plaintiffs dispute the significance of these findings, and, in some cases, the facts underlying them, plaintiffs have not demonstrated that DACO's analysis is irrational so as to prevail under the rational relationship test.

DACO has the prerogative to choose the findings of one enlightened expert over another, and based on the economic studies before it DACO could rationally conclude that the market was not sufficiently competitive and that price controls were needed. Whether this is good economics, good politics, or good public policy is, in the context of a rational basis analysis, beyond the court's mandate to determine. Rational people could have concluded, for better or for worse, that the gasoline market was not as competitive as it ought to be and in need of governmental tinkering.

*Tenoco* controls. The substantive due process road is thus a dead end. Summary judgment is GRANTED in favor of defendants on this aspect of the complaints.

### III. *Takings Clause Analysis*

#### A. The Standard

The takings clause issue warrants more extended discussion. At the outset, we must discern the proper standard to be applied in determining when an agency's exercise of ratemaking authority is violative of the fifth amendment. In addition, we must decide to what extent the court may second-guess the calculations and methodology employed by the agency, for in this case plaintiffs not only challenge the adequacy of the rate set by DACO, but also dispute the validity of several calculations made by DACO to arrive at this rate and to estimate its effects on the industry.

■ In evaluating taking-clause cases, the Supreme Court has "eschewed the development of any set formula for identifying a 'taking' forbidden by the Fifth Amendment, and [has] relied instead on ad hoc, factual inquiries into the circumstances of each particular case." *Connolly v. Pension Benefit Guaranty Corp.*, 475 U.S. 211, 224, 106 S.Ct. 1018, 1026, 89 L.Ed.2d 166 (1986); *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1005, 104 S.Ct. 2862, 2874, 81 L.Ed.2d 815 (1984). The court should look to 1) the economic impact of the regulation on the claimant, 2) the extent to which the regulation has interfered with investment-backed expectations, and 3) the character of the governmental actions. *Connolly*, 475 U.S. at 225, 106

S.Ct. at 1026; *Penn Central Transportation Co. v. New York City*, 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978). While "neither law nor economics has yet devised generally accepted standards for the evaluation of rate-making orders," *In re Permian Basin Area Rate Cases*, 390 U.S. 747, 790, 88 S.Ct. 1344, 1372, 20 L.Ed.2d 312 (1968), several cases have held that a rate need only be "just and reasonable" in order to pass muster under the takings clause. *See, e.g., Duquesne Light Company v. Barasch*, 488 U.S. 299, 109 S.Ct. 609, 615–16, 102 L.Ed.2d 646 (1989); *Tenoco*, 876 F.2d at 1020. This does not mean that a rate must be set at any particular level; rather, courts will uphold any rate which is within a wide "zone of reasonableness." *Permian Basin Area Rate Cases*, 390 U.S. at 767, 88 S.Ct. at 1360. The leeway afforded by a wide zone of discretion is needed so that an agency may properly balance the interests of investors against its mandate to protect consumers.

Takings clause cases involving price regulation generally fall into one of two major categories, either the setting of rates for a wholly regulated public utility which has a monopoly in its particular area of service, *Duquesne*, 109 S.Ct. at 609, or the setting of rate or price restrictions on a market with at least several wholly private actors. *Pennell v. City of San José*, 485 U.S. 1, 108 S.Ct. 849, 99 L.Ed.2d 1 (1988) (rent control); *Permian*, 390 U.S. 747, 88 S.Ct. 1344, (natural gas manufacturers); *Nebbia v. New York*, 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940 (1934) (minimum price for milk); *Bowles v. Willingham*, 321 U.S. 503, 64 S.Ct. 641, 88 L.Ed. 892 (1944) (rent control).

■ When examining the regulation of a public utility, courts are particularly concerned with the rate of return on investment to the investors in the utility, specifically looking to the ability of the utility to raise capital and maintain its basic financial integrity under the regulation as imposed. *Duquesne*, 109 S.Ct. at 618. It is plaintiffs' position here that the court should focus individually on each plaintiff's individual profit structure and to invalidate the

regulation under the just and reasonable standard exactly as if the regulated company were a public utility. DACO urges that the just and reasonable standard is wholly inapplicable, and that we should look only to an industry-wide analysis based on the factors as set out in non-public utility cases.[15] We mold a standard that, while applying the just and reasonable standard, takes into account the differences between regulation of utilities and regulation of a market. We believe our approach is consistent with Supreme Court precedent rejecting a formulaic approach in takings analysis. *Connolly*, 475 U.S. at 224, 106 S.Ct. at 1025.

It is true that courts faced with rate-setting for public utilities have concerns different from courts examining the regulation of a *market*. In the utilities setting, the financial integrity of the utility is a matter of public interest and is inherently the concern of the regulatory agency and the reviewing court. Financial integrity of the utility enterprise as to the operation regulated must be maintained or the service at issue may not be provided at all. In the case of a market with private actors the focus is less on the individual company, and more on the overall industry effect. It is well accepted that price or rate setting will severely limit the profitability of some of the market participants. The court facing, for example, rent regulation, does not concern itself with the fate of each individual landlord's rate of return, but looks instead to the effect of the entire industry. If it were not so, any landlord driven out of the market in Berkeley or the South Bronx would be able to invalidate an entire city's rent control structure based on its effect on that particular landlord. Obviously, that is not the current state of the law.

In *Permian Basin Area Rate Cases*, 390 U.S. 747, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968), the Court held that an agency could calculate rates for a group or class without first evaluating the separate financial position of each class member, even though as a result high cost operators would be more seriously affected than others. *See also Wisconsin v. Federal Power Commission*, 373 U.S. 294, 83 S.Ct. 1266, 10 L.Ed.2d 357 (1963) (approving discontinuance of individual company cost-of-service determinations in favor of area-wide maximum rates for natural gas). While we do not believe, given the limited number of major wholesalers in Puerto Rico, that DACO could refuse to examine the data from the individual companies, *American Commercial Lines, Inc. v. Louisville & N.R.R.*, 392 U.S. 571, 595 n. 1, 88 S.Ct. 2105, 2117 n. 1, 20 L.Ed.2d 1289 (1968) (Harlan, J. concurring), we do think that *Permian* teaches that the focus should be on the industry-wide effect.

Wholesaling of gasoline in Puerto Rico lies somewhere between the extremes of an individual public utility and a rental market with thousands of providers. We accordingly apply a hybrid, or modified, "just and reasonable" return standard, one which will take into account the economic effect on each individual wholesaler, yet will focus more on the effect on the industry as a whole than on any individual actor. "It is implicit in cases such as *Nebbia v. New York*, [*supra*, full citation omitted] ... that high cost operators may be more seriously affected by price control than others." *Bowles*, 321 U.S. at 518, 64 S.Ct. at 649.

To avoid a finding that a taking exists, those most severely affected must be afforded the opportunity to leave the regulated market. "It is well established that government price regulation does not constitute a taking of property where the regulated group is not required to participate in the regulated industry." *Whitney v. Heckler*, 780 F.2d 963 (11th Cir.), *cert. denied*, 479 U.S. 813, 107 S.Ct. 65, 93 L.Ed.2d 23 (1986); *Permian*, 390 U.S. at 770–75, 88 S.Ct. at 1361–64; *Bowles*, 321 U.S. at 517–18, 64 S.Ct. at 648–49.[16]

---

**15.** We do not understand how DACO continues to deny the applicability of the just and reasonable standard in light of the Court of Appeals' specific directive in *Tenoco*, 876 F.2d 1013 (1st Cir.1989), that the standard applies here.

**16.** Shell's argument that it is not free to leave the market is dealt with in section (E)(4), *infra*.

Therefore, we will look to the effect of this regulation on the industry as a whole, taking into account the various effects on the plaintiffs as individual entities, but we are not constitutionally required to assure any particular private wholesaler in the Puerto Rico marketplace any predeterminable level of return. We will look first to the challenge to the methodology by which DACO arrived at its various valuations, and then we will look to the overall effect. *FPC v. Hope Natural Gas Co.*, 320 U.S. 591, 602, 64 S.Ct. 281, 287, 88 L.Ed. 333 (1944).

### 1. *The Standard to Apply to Methodology*

In *Hope Natural Gas*, 320 U.S. at 602, 64 S.Ct. at 287, the Supreme Court observed that in applying the just and reasonable test "it is not theory but the impact of the rate order which counts. If the total effect of the rate order cannot be said to be unreasonable, judicial inquiry ... is at an end. The fact that the method employed to reach that result may contain infirmities is not then important." [17] In *Duquesne Light Co. v. Barasch*, 488 U.S. 299, 109 S.Ct. 609, 102 L.Ed.2d 646 (1989), the Court upheld a state agency's choice to exclude from the rate base a company's expenditures on an abandoned nuclear power plant, even though these expenditures were prudent and reasonable when made. In approving Pennsylvania's policy of allowing a return on only those investments "used and useful" to the public, the *Duquesne* Court observed that "[t]he economic judgments required in rate proceedings are often hopelessly complex and do not admit of a single correct result. The Constitution is not designed to arbitrate these economic niceties." *Id.* 109 S.Ct. at 619. In each case, a heavy burden of proof is on the plaintiffs. *Permian*, 390 U.S. at 767, 88 S.Ct. at 1360.

### B. An Overview of DACO's Methodology

With these standards in mind, we turn to the Final Order and to plaintiffs' objections thereto. At the outset, we note that DACO did not set separate price margins for each gasoline wholesale company, but rather established a 13 cent gross profit margin applicable to the entire wholesale industry. Nor, in setting this rate, did DACO examine the financial situation of each and every wholesaler operating in Puerto Rico. DACO only analyzed financial information submitted by each of the four high-cost wholesalers, including the three plaintiffs in this case, and not the roughly 20% of the market which is made up of small wholesalers.

More specifically, prior to setting the 13 cent price margin, DACO attempted to estimate the consequences that various suggested price margins would have on each major wholesaler during the test year of 1989. First, DACO calculated each company's total gross income under each margin, including the 13 cent margin, by multiplying this figure by each company's estimated 1989 sales volume. Second, DACO determined each company's net income by subtracting its admissible operational costs from the gross income figure. In so doing, DACO did not always accept the operational costs as claimed by a certain company but in some instances adjusted the operational costs in ways it thought appropriate. Next, DACO determined the net assets of each company on which they are entitled to obtain a yield. Generally, these assets included all property, plants and equipment specifically devoted to the gasoline wholesale business, plus a corresponding portion of those assets used for more than one business. Again, however, DACO did not blindly follow the submissions of the companies, at times choosing to make its own adjustments. Finally, DACO determined the overall return on assets for each com-

---

**17.** Specifically, the two methods of valuation under consideration in *Hope Natural Gas* were the "historical cost" method (*i.e.,* the actual cost when made of all investments prudently devoted to public use) and the "fair value" rule (*i.e.,* the actual present value of all assets employed in the public service). Until *Hope Natural Gas,* the fair value rule was considered the only constitutionally acceptable method of fixing utility rates. *See Smyth v. Ames,* 169 U.S. 466, 18 S.Ct. 418, 42 L.Ed. 819 (1898).

pany by dividing its net income by its allowed investments, taking into account taxes to be paid by a company at a 42% tax rate.[18]

Applying this calculus, DACO estimated the following after-tax return on overall assets at a 13 cent per gallon profit margin: CAPECO (15.3%);[19] Texaco (12.94%); Esso (11.99%); and Shell (5.2%). Final Order at 88–89. Taken together, DACO estimated that the average after-tax return on assets of the four majors would be 10.8%. DACO did not estimate the average return on assets for the entire wholesaling industry in Puerto Rico, but has stated that this figure would be significantly higher than 10.8% given the fact that the individual returns of the smaller, more efficient wholesalers, which were not included in the study, would be much higher than those of the majors.[20] In any event, DACO found that the 10.8% figure constituted a reasonable return on assets for the four major wholesalers as a group, and thus adopted a 13 cent per gallon figure as the maximum wholesale margin in Puerto Rico.

Esso, Texaco and Shell dispute DACO's conclusion that the 13 cent profit margin would result in the returns indicated above.

## C. ESSO

Esso makes two broad arguments. First, Esso disputes DACO's conclusion that under a 13 cent profit margin it will achieve an 11.99% return on assets, arguing that this conclusion was based on improper adjustments made in Esso's rate base and that properly calculated Esso would earn less than a 6% return, which Esso claims is clearly confiscatory. Second, even accepting DACO's 11.99% figure, ESSO argues that this, too, is confiscatory and that it cannot maintain its financial integrity with anything less than a 14% return on equity.

### 1. DACO's Adjustments of Esso's Rate Base

With respect to the first argument, Esso observes that DACO reduced Esso's claimed $35.4 million asset base by $7.2 million—a net reduction of more than 20 per cent.[21] DACO also disallowed approximately $2.6 Million of the $20.4 Million Esso claimed in operating expenses—a reduction of almost 13 per cent.[22] The cumulative effect of those adjustments, according to Esso, based on a margin of 13 cents per gallon, is the same as if DACO had reduced Esso's after-tax rate of return on its claimed $35.4 Million asset base to 5.4 percent.[23] DACO, for its part, does not dispute that it reduced Esso's asset base and expenses by more or less the amounts claimed. Instead, DACO argues that it had

---

**18.** DACO also calculated each company's return on equity, using in each case a hypothetical 50/50 debt to equity ratio. As will be discussed further in the text below, plaintiffs' actual debts to equity ratios are more conservative than the 50/50 figure, and so they contest the use of the hypothetical standard and any conclusions derived from using it.

**19.** CAPECO is not a plaintiff in this case and has not objected to the 13 cent maximum profit margin established by the Final Order. As explained in note 5, *supra,* CAPECO is the Caribbean Petroleum Company, which purchased Gulf's assets.

**20.** DACO did not solicit information from the independent wholesalers because these companies did not object to the 11 cent profit margin prescribed by the Interim Order. Nor do they object to the Final Order's 13 cent margin.

**21.** DACO's exclusions from Esso's claimed net capital investment were the following: (1) in-

vestment in "Servacar" stations ($4 Million); (2) Cataño Terminal and Main Office ($2.4 Million); (3) 1990 environmental facilities ($2.8 Million). The total of the above is $9.2 Million. DACO *added* $2 Million to Esso's capital base to correspond to inventories. Thus, the overall effect of DACO's adjustments to the capital base was a net reduction of $7.2 Million. Esso, however, has not herein objected to DACO's treatment of its Cataño and Main Office investments. *See* Esso Brief at 95.

**22.** DACO disallowed the following claimed operating expenses: (1) allocation of indirect expenses ($927,000); (2) 1990 estimated environmental expenses ($1.3 Million); (3) advertising ($328,530).

**23.** In arriving at the 5.4% figure Esso apparently expects a wholesale return on investments made in its Cataño Terminal and Main Office. However, as explained in footnote 21, Esso has made no argument that DACO's exclusion of these investments from its asset base was improper.

good reasons for doing so and that in each case its decisions were supported by substantial evidence and were otherwise within its regulatory authority. We examine those adjustments below.

### a. Allocation of Indirect Expenses

■ In determining Esso's net operating expenses, DACO was forced to decide how much of the company's general administrative expenses not directly attributable to a particular product line should be allocated to its wholesaling business.[24] In its Final Order, DACO chose to allocate general administrative expenses based on the proportion of volume sold by a company's respective branches. In doing so, DACO rejected Esso's proposed three-factor method of allocating administrative expenses,[25] which attributed a greater percentage of administrative costs to wholesaling than did DACO's method.[26] Consequently, Esso's claimed operating expenses were trimmed by nearly $1 Million.

DACO's choice of one method of allocation over another falls well within its discretion as discussed above. "The economic judgments required in rate proceedings are hopelessly complex and do not admit of a single correct result." *Duquesne*, 109 S.Ct. at 609. Allocation of indirect operating costs is by nature a fuzzy process better left to agency determination than to the courts. We do not think that DACO's choice of method in this instance can "properly be characterized as having a constitutional dimension, despite the fact that [it] might affect property rights to some degree." *Id.* at 617. What is more, DACO's volume sold method is reasonable on its face. It is easily calculated, easily verifiable and does not require extensive analysis of a company's other business lines. By contrast, Esso's proposed method requires, in addition to analyzing a company's sales volumes, an analysis of the respective profit margins and direct costs of a company's various business lines. We cannot fault DACO for adopting standards that are uniform and easy to apply.

Moreover, both Esso and DACO agree that only a portion of the administrative costs should be recoverable through Esso's wholesale rates. The dispute is over how much. DACO's adjustment does not prevent the recovery of Esso's indirect costs, but merely forces Esso's other business lines to bear a part of those expenses. *See Colorado Interstate Gas Co. v. Federal Power Commission*, 324 U.S. 581, 588, 65 S.Ct. 829, 833, 89 L.Ed. 1206 (1945) (one goal of ratemaking is to "allocate to each class of the business its fair share of the costs"). DACO therefore has an interest in protecting consumers from being forced to pick up the tab for expenses more properly attributable to Esso's other business lines. We cannot say DACO has promoted this interest unreasonably.

Rather than argue that DACO's method is unreasonable, Esso has gone to great lengths to prove the reasonableness of its three-factor approach. We think this effort is misdirected. Under takings clause analysis, an agency determination carries a "presumption of validity" and the regulated party carries "the heavy burden of making a convincing showing that it is unjust and unreasonable in its consequences."

---

**24.** Such expenses include "accounting department and legal counsel costs, managerial and executive salaries, rents for office space, as well as expenses associated with information and communication systems, maintenance, and the administration of benefits and services to employees. They arise in the management, execution, and administration of Esso's wholesale marketing of gasoline ... as well as in connection with its sales to industrial, aviation, and marine customers...." Esso Brief at 73.

**25.** Esso explains its three-factor approach as follows: "The volume (in barrels) sold, the profit margin (in thousands of dollars) realized, and the direct expenses (in thousands of dollars) incurred in each line of business are calculated initially. For each business line, the three figures are then added together. The allocation for the wholesale line is the relation, stated as a percentage, that its three-figure total bears to the aggregate of the three-figure totals for all lines of business." Esso Brief at 75.

**26.** Esso's formula allocates 73% of its indirect expenses to its wholesale gasoline business, even though only 61% of its sales volume is gasoline. Under DACO's approach, Esso can attribute only 61% of these costs to its wholesale business.

*Permian,* 390 U.S. at 767, 88 S.Ct. at 1360. Regardless of the merits of Esso's approach, Esso has failed to prove that the volume of sales method is constitutionally flawed.

### b. Environmental Expenses and Investments

Esso also contests DACO's exclusion of money it anticipates spending in 1990 in compliance with two federally-mandated environmental programs. These expenditures are of two sorts. First, Esso seeks to add to its capital base $2.8 Million needed to replace an underground storage tank in compliance with regulations of the Environmental Protection Agency ("E.P.A."). Second, Esso claims that in 1990 it will incur an estimated $1.3 Million in environmentally-related operating costs. While DACO has allowed all of Esso's claimed environmental expenses and investments which correspond to the test year of 1989, it has refused to consider the projected 1990 costs because to do so would deviate from the historical "test year" approach. *See* Final Order at 58. Under that approach, a ratemaking agency considers the past twelve-month interval as generally reflective of a company's ongoing operating expenses and uses data from that period as a starting point for the ratemaking process. *See generally* J. Bonbright, A. Danielson & D. Kamerschen, *Principles of Public Utility Rates* 201–02 (2nd Ed.1988).

▮ Esso does not generally dispute DACO's use of the test-year approach. However, Esso claims that in this instance DACO's rigid adherence to the test-year formula will result in an inaccurate picture of its 1990 experience. Esso cites numerous state law cases in which courts have directed ratemakers to "revise test-year results to account for changes in the utility's financial position likely to occur in the future." *Camden & Rockland Water Co. v. Maine Pub. Utils. Comm'n,* 432 A.2d 1284, 1287 (Me.1981). *See also In re Northwestern Bell Tel. Co., Omaha,* 218 Neb. 563,

565–67, 357 N.W.2d 443, 446–47 (1984); *Utah Power & Light Co. v. Idaho Pub. Utils. Comm'n,* 105 Idaho 822, 825–26, 673 P.2d 422, 425 (1983); *Commonwealth v. Virginia Elec. & Power Co.,* 211 Va. 758, 180 S.E.2d 675 (1971). Particularly, in *Virginia Elec. & Power Co.,* the Supreme Court of Virginia ordered a ratemaking agency to take into account "environmental protection expenditures to be incurred after the test year" in order "to make the test year representative of the future." *Virginia Elec. & Power Co.,* 211 Va. at 771, 180, S.E.2d at 685.

Having viewed the relevant precedent, the court has no doubt that Esso is entitled to a recovery on any money it actually spends in compliance with federally-mandated environmental programs. At the same time, we are conscious of DACO's need, consistent with the test-year approach, to base its determinations on a consistent set of data. We also note, as DACO points out, that no other revenue, investment or expense figures had been adjusted for 1990, that the use of one estimated figure would skew the entire analysis,[27] that Esso's 1990 projections were merely estimates at the time they were presented, that they were first tendered late in the administrative process (November 13, 1989), and that they have been adjusted since the Final Order was issued. All of this leads DACO to argue that these expenses are not sufficiently "likely to occur"—at least in the amounts claimed—so as to warrant an exception to the test-year approach. The court thus finds that DACO acted constitutionally in establishing a price margin based on what solid information it had at the time. Nevertheless, the court thinks that when the 1990 figures are sufficiently solid, Esso should be allowed, if the situation so warrants, to petition DACO to refigure its asset base and to take whatever action is found appropriate, especially since DACO has expressed a willingness to allow recovery on these expenses if and when they actually occur. *See* DACO Brief at 29 ("[T]he 13 cent mar-

---

**27.** To this end, DACO notes that an increase in sales volume in 1990 could have the effect of offsetting the projected environmental expenses.

gin already allows Esso to recover all of its costs incurred in 1990 up to the 1989 levels, and DACO will allow Esso to recover any additional costs at the same time that it considers all of Esso's 1990 revenues and costs"). DACO acted reasonably in basing its ratebase on 1989 data, leaving open the possibility of a later adjustment at an appropriate time.

### c. Advertising Expenses

■ Esso next objects to the fact that DACO refused to consider as part of its operating expenses any money spent on advertising exceeding .3 cents per gallon. This decision, according to Esso, will result in trimming $328,530 off of Esso's projected annual expenses.[28] DACO made this ruling after reviewing Esso's advertising and determining that it in part promoted the use of expensive high octane fuel that is beneficial to only a small percentage of cars in Puerto Rico. The .3 cent limitation was based, in part, on DACO's conclusion that advertising promoting high octane fuel is not in the public interest.

The bulk of Esso's argument against DACO's limitation of advertising expenses consists of disputing DACO's characterization of the purposes of its advertising and alleging that any limitation on advertising will serve to decrease competition in the industry. In pursuing this line of argumentation, however, Esso is inviting the court to substitute its judgment on policy issues that have been entrusted to the agency. This the court cannot do. *Ferguson v. Skrupa*, 372 U.S. 726, 731, 83 S.Ct. 1028, 1031, 10 L.Ed.2d 93 (1963). So long as the final effect of DACO's determination is not confiscatory, DACO is free to make policy determinations relevant to the protection of the consumer, including limiting advertising. *Cf. Public Service Commission of New York v. FERC*, 813 F.2d 448, 456 (D.C.Cir.1987). Moreover, we note that because the limitation on recoverable advertising expenses is prospective in nature, it does not prevent recovery of amounts actually spent. Nor does the Final Order prohibit Esso from advertising as much or in any way it sees fit; it merely prevents Esso from passing on to the consumer any cost exceeding .3 cents per gallon. We cannot say this is unreasonable.

### d. Servacar Stations

■ The final adjustment Esso objects to involves $4 Million of investment in nine "Servacar" gasoline stations which DACO deleted from Esso's asset base. While the court does not think DACO's treatment of these stations by itself is constitutionally infirm, some background is in order.

Esso sells gasoline on a wholesale basis to over three hundred retail stations in Puerto Rico. There are three categories of Esso retail stations. First, Esso sells gasoline to 125 stations owned and operated by independent dealers under long-term supply contracts. Second, Esso owns 167 retail stations that it leases under long-term agreements to unaffiliated third parties who operate the stations. Third, Esso sells gasoline to 9 stations that are wholly owned and operated by Esso through its "Servacar" affiliate.

The Final Order treats Esso's dealings with each category differently. With regard to the first category, DACO included Esso's gasoline sales to these stations as part of Esso's net wholesale income. Obviously, DACO did not include the stations in this category part of Esso's investment in the wholesale gasoline business because Esso does not own these stations. As for the second category, DACO included Esso's sales to these stations as part of its gross income. The Final Order included these stations in Esso's wholesale investment, concluding that they were an integral part of the wholesaling business. However, DACO factored out the rent received by Esso from the tenant/operators in order to avoid a double recovery on Esso's investment in these stations.

With regard to the third category, DACO refused to consider the 9 Servacar stations

---

**28.** DACO has allowed all claimed advertising costs for the test year 1989 and the .3 cent

limitation is to be used prospectively.

as part of Esso's wholesaling business because these stations generate revenue for Esso through their retail sales. Thus, DACO concluded that any return on the investment in these stations should come from Esso's retailing business rather than from the wholesale margins. DACO also found that because Esso receives retail profits from these stations Esso would receive a double recovery if they were included in Esso's wholesale asset base. Esso, however, claims that these stations are functionally equivalent to the category two stations in that their main purpose is to increase the company's wholesale volumes and to serve as a testing ground for Esso products and marketing techniques.

The court finds that DACO acted within its discretion in regarding the Servacar stations as an investment in a retail—and not a wholesale—industry. It is undisputed that these stations are operated by Esso and that, regardless of any secondary benefits they might have to Esso's wholesale business, the overt function is to sell gasoline and other products to the public on a retail basis. This alone supplies DACO with sufficient factual basis to conclude that the investment in these stations is more properly attributable to its retail business and that the recovery on such investment should be derived through Servacar's retail sales.[29] Nor is the court persuaded that DACO acted impermissibly in including in Esso's net wholesale income amounts corresponding to Esso's *wholesale* sales to Servacar. It is undisputed that the price charged to the public at the Servacar stations reflects both a wholesale and a retail margin. Therefore, although the *retail* revenues from the Servacar stations should not be and are not included in the calculation of Esso's wholesale rates, Esso's *wholesale* revenues must be included in the calculation regardless of whether these wholesale revenues are earned in sales to Servacar or an unaffiliated retailer. The profit earned by the Servacar stations in retail sales should properly include only the difference between the wholesale and retail rates. Otherwise, Esso will receive a double recovery on its Servacar stations—once from the wholesale profit that has been excluded from the calculation of Esso's wholesale rates, and once from the retail profit earned by those stations. DACO acted permissibly in preventing such a double recovery.

e. The Cumulative Effect of DACO's Adjustments on Esso

■ At this stage Esso argues that even if each of DACO's adjustments is constitutionally permissible when viewed separately, their cumulative effect constitutes a taking without just compensation in violation of the fifth amendment. To this end, Esso points to the "final result" test of *Hope Natural Gas* and, more particularly, the Supreme Court's analysis in *Duquesne* concerning the financial impact of excluding an abandoned nuclear power plant from a utility's rate base. There, the Court found that even if an agency may permissibly adopt a theory of valuation that excludes recovery of the investment in an unused power plant, the financial effect of excluding this amount from a company's rate base must be analyzed under the takings clause. While the *Duquesne* Court ultimately found that the excluded amount constituted an insignificant percentage of the company's claimed asset base (1.9%), presumably a taking would have been found if the financial impact of the exclusion were proven to be greater. *Duquesne*, 109 S.Ct. at 618.

With *Duquesne* as its model, Esso claims that the total effect of all of the exclusions

---

**29.** DACO has noted that under the maximum retail margin, Esso's Servacar stations would generate over $3 Million in additional revenues. Dr. Logan Declaration at 7–10. Esso has responded by arguing that the Servacar stations do not produce this much in revenue due to the fact that they sell gas below the allowed marginal levels in order to compete with lower cost operators, and in fact make little or no retail profits. Esso Reply Brief at 48–49. This, however, only goes to prove DACO's argument that the effect of allowing Esso a wholesale return on its Servacar investment is to subsidize, through its wholesale margins, its retail business and as a consequence allow it an unfair advantage over its retail competitors. DACO Response to Esso Brief at 29–32.

and adjustments discussed in the subsections above is the same as if DACO had allowed Esso less than a 6% annual return on assets. However, the court finds a fundamental difference between the facts of *Duquesne* and the case before it now. In *Duquesne,* the plaintiffs were denied a return on money they had actually spent. Moreover, these same plaintiffs had no other way of recovering their losses other than through their electricity rates. In contrast, the losses incurred by Esso via DACO's exclusions are not completely unrecoverable. Of the $7.2 Million excluded from Esso's claimed asset base, we note the following: (a) Esso has the potential for a return on its Servacar investment ($4 Million) through retail sales; and (b) Esso has not contested the exclusion of the additional $2.8 Million of investment in its Main Office and Cataño Terminal, DACO having found that this amount was more properly attributable to—and recoverable by— Esso's other business lines. A similar situation exists with respect to operational costs: the disallowed administrative expenses (nearly $1 Million) are recoverable through other product lines, and the prospective advertising expenses (more than $300,000) can be avoided through budget adjustments. Finally, as we have stated, DACO has expressed a willingness to allow recovery for future environmental costs once they have actually been incurred. In short, unlike the situation in *Duquesne,* the vast majority of the disallowed investments and expenses are potentially recoverable by Esso. Thus, the court cannot accept Esso's allegation that the final impact of DACO's order is to allow Esso less than a 6% annual recovery on assets.

### D. Texaco

■ Texaco first contests DACO's disallowance of $187,712 in projected advertis-

ing expenses as part of its claimed net operating costs. However, as discussed above, DACO's treatment of advertising expenses fell within its discretion. Furthermore, any costs over .3 cents per gallon are avoidable due to the prospective nature of DACO's determination on this issue. Therefore, we find Texaco's argument on this point to be without merit.

■ Texaco also objects to DACO's determination of its asset base, claiming that DACO excluded inventory and other assets which Texaco uses exclusively in its gasoline wholesaling business. DACO, however, responds that this is the first time Texaco has made this claim. Indeed, the Final Order indicates that DACO originally valued all the companies' assets based on a volume of product formula but revised this formula in the cases of Esso and Shell, each of which made presentations proving certain assets were used exclusively in the wholesaling business. *See* Final Order at 59–75. Texaco did not make this type of claim at the administrative level, even though it had the opportunity to submit a detailed analysis of its own investment base. We think it is too late in the day to attempt for the first time to require DACO to use a different method of valuation.

■ Finally, Texaco objects to DACO's use of the volume of product method of valuation rather than the "net assets minus cash" method. But as discussed above, DACO is not required to select any particular method of valuation so long as the method chosen is rational and does not produce unreasonable results. *Hope Natural Gas,* 320 U.S. at 602, 64 S.Ct. at 287.[30]

### E. Shell

Shell asserts that 1) DACO should not have included CAPECO in its calculations of the wholesale industry average return

---

**30.** Texaco also argues that DACO's regulation of gasoline prices is preempted by or otherwise violates the Sherman Act's policy of promoting competition in an industry. We find no merit in this claim, noting that DACO's undisputed interest in this case is to protect consumers and that there is no concerted action requisite to a Sherman Act violation. *Fisher v. Berkeley,* 475 U.S. 260, 106 S.Ct. 1045, 89 L.Ed.2d 206 (1986);

*Parker v. Brown,* 317 U.S. 341, 351, 63 S.Ct. 307, 313, 87 L.Ed. 315 (1943). Similarly we find absolutely no merit in Texaco's claim that the delegation of legislative authority to DACO is somehow unconstitutional for vagueness. We believe the delegation is quite clear. *See,* 3 L.P.R.A. §§ 341b *et seq.* (1982). Accordingly, both of these causes of action are DISMISSED.

(and that the erroneous inclusion falsely inflated the industry average return); that DACO's advertising cost cap was improper since there was no factual support for DACO's contention that advertising expenses were concentrated on the sale of high-octane gasoline; that DACO excluded the increase in value of assets that Shell purchased from Mobil and made other improper downward adjustments to Shell's operational costs, and that a factual issue exists as to DACO's finding that Shell is an inefficient operator, precluding summary judgment.[31] We will take these objections up in turn.

### 1. *Inclusion of CAPECO*

■ DACO's setting of the profit margin at 13 cents per gallon was based at least partially on its calculation that allowing a 13 cent margin would yield an average after-tax return on assets for the four major wholesalers of 10.8%. DACO based its average on a finding that the after-tax return for the big four would be: CAPECO (15.3%); Texaco (12.94%); Esso (11.99%); and Shell (5.2%).[32] DACO excluded the average returns on the smaller wholesalers who make up the 20% of the market not occupied by the big four. The smaller wholesalers have lower costs, would tend to receive much higher percentage returns on assets, and do not challenge the order as imposed.

Shell argues that, in addition to excluding the small wholesalers from its "average industry" calculations, DACO also should have excluded CAPECO, the major wholesaler with the highest return on assets of the four included in DACO's study. Shell claims that the exemption is required because of the atypical nature of CAPECO's operation. According to Shell, CAPECO's wholesale business, (its so-called "Marketing Division"), uses the storage and loading facilities of a refinery. Therefore, the full costs of wholesaling are not reflected in DACO's numbers. Shell asserts that as a result, CAPECO's costs of storage and loading of gasoline as used by DACO appear artificially low compared to the other three major wholesalers whose total wholesaling costs including storage and loading were taken into account. Alternatively, Shell argues that if DACO refused to eliminate CAPECO entirely, it should at least have added some figure to CAPECO's costs which would have reflected the costs properly attributable to wholesaling which were being absorbed by the refinery operation.

Shell's expert, Jorge F. Freyre, Ph.D., an economic consultant, after lauding DACO for excluding the minor wholesalers, opined that "costs of operation incurred by CAPECO's Marketing Division are not exactly comparable to the costs of other major wholesalers." Freyre Report at 17. While there may be solid arguments supporting the exclusion of CAPECO from the averages, we believe that DACO's desire to include all of the *major* wholesalers is at least defensible, and is within the broad area of discretion which courts have allowed recognizing that "[t]he economic judgments required in rate proceedings are often hopelessly complex and do not admit of a single correct result." *Duquesne*, 109 S.Ct. at 619. Even reviewing Shell's own expert's statements we are not convinced that the inclusion of CAPECO was any more than arguably inadvisable, and therefore not rising to the level of error which necessitates our intervention. We note that while the big four average is slightly higher than it would have been without CAPECO, it is significantly *lower* due to the inclusion of Shell's rate of return. Had Shell been excluded as "atypical" due to its rate of return of 40% less than the next lowest in the industry, the industry-wide average would have risen measurably.

### 2. *Advertising Adjustments*

■ Shell makes the same objections to the limitations on advertising as the other

---

**31.** We need not review those arguments of Shell's which parallel arguments already dealt with in the context of the two other major producers, such as the effect of the exclusion of Esso's Servacar stations from Esso's capital base.

**32.** As noted, *supra,* CAPECO has not challenged DACO's regulation and is not a plaintiff in this action.

majors, and the court's position on those points need not be repeated. Shell adds an argument unique to it, however, in saying that Shell itself produced evidence that *its own* advertising did not highlight high-octane fuel, and therefore limitation on its advertising budget as a part of operational expense amounts to a "taking" or adds to a confiscatory result which is a "taking". Again we return to the principle that the agency has broad powers to regulate the industry. That Shell's own advertising may not fit the profile of industry advertising as found by DACO does not require us to invalidate the regulation. Shell's further assertion that the *policy* of DACO with respect to advertising is misguided is not an argument which this court will entertain. Shell's invitation that we invalidate the rate because we disagree with DACO's policy regarding advertising could only be justified by resort to a substantive due process analysis long since dead. *West Coast Hotel v. Parish*, 300 U.S. 379, 57 S.Ct. 578, 81 L.Ed. 703 (1937). (Beginning of the end of so-called "Lochnerian" due process.) We cannot be drawn into such a discredited result merely because we are supposedly operating under the banner of "takings" rather than "due process".

### 3. *Other Adjustments*

■ Shell's main objection to DACO's adjustments is DACO's refusal to add the increase in value of assets Shell purchased from Mobil, including step-up costs and good will. DACO employed the "original cost" method developed to value public utility assets by setting them at the original cost of the first owners who placed the property in public use. *Niagara Falls Power Co. v. Federal Power Commission*, 137 F.2d 787, 793 (2nd Cir.), *cert. denied*, 320 U.S. 792, 64 S.Ct. 206, 88 L.Ed. 477 (1943). The method is designed to protect against a public utility falsely "overvaluing" an acquired asset in order to apparently reduce its ratio of profit to asset base, and thereby ward off excessive price regulation. DACO agrees that the original cost valuation may not be proper where the purchaser and the seller of the disputed asset have bargained at arm's length (pre-

sumably because such bargaining results in a "true" or market-set price which may be reliable as the proper indicator of the asset's worth). Shell argues that its purchase of assets from Mobil was such a purchase, and that it was constitutional error for DACO to fail to apply the full "value" of the assets as reflected in Shell's books rather than the lower original cost valuation.

DACO defends its valuation by highlighting the fact that Shell's acquisition of Mobil's assets was in fact a complete buy-out of Mobil. In December of 1988, Shell purchased all of the assets of Mobil, dissolved the corporation and then attributed a "stepped-up" value to its assets. Under such circumstances, we cannot find DACO's decision not to consider this an "arm's length" sale to be constitutionally infirm.

DACO took a long-accepted valuation practice for public utilities and adapted it to the relatively small market of gasoline wholesalers in Puerto Rico. DACO rejected Shell's categorization of the sale as arm's length, since Mobil was assimilated into Shell as a result of the sale. We cannot say that this, or any of the other downward adjustments made, on their own, or taken together, are so unsupported as to trigger constitutional protection. We find nothing objectionable in the method. *Hope Natural Gas*, 320 U.S. at 602, 64 S.Ct. at 287.

### 4. *Shell's Inefficiency*

■ Shell urges that a material and genuine factual issue exists as to DACO's allegation that Shell is an inefficient operator. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). While we might agree that a genuine factual issue exists, and that we could not determine on this record whether it is correct that Shell could be termed relatively inefficient, we do not agree that the issue of Shell's efficiency is necessarily *material* to our disposition of the case. Although Shell's allegation that it is in fact efficient might be one factor to consider in the industry-wide analysis, it would not be enough, even if proven, to invalidate this

regulation. Even if DACO's regulation has a seriously deleterious effect on one *efficient* operator, it can still pass constitutional muster so long as the majority of wholesalers are left with a rate of return sufficient for the industry as a whole, and the most adversely affected operator has some substantial profit margin over costs. This result is mandated by the Supreme Court's treatment of the natural gas market in *Permian,* in which the Court specifically envisioned that the regulation of the market might burden or even drive out higher priced operators, efficient or otherwise. The *Permian* Court made no requirement that every operator be separately evaluated on an efficiency scale.

We are mindful of the language of the First Circuit in *Tenoco* in which the Court wrote that "such factors" as the efficiency and rate of return on each wholesaler would be relevant factors, (*Tenoco,* 876 F.2d at 1026), but we do not believe that the Circuit Court meant there to develop a new rule requiring a finding of inefficiency as a prerequisite to imposition of heavily burdensome regulation. Instead, we read the *Tenoco* language consistently with Supreme Court doctrine as set out in *Permian* and other rate cases *involving a market,* in which efficiency of any individual producer may only be one element in the regulatory calculus.

F. Overall Effect on Puerto Rico Wholesaling Industry

 Having found nothing constitutionally impermissible in DACO's various adjustments, valuations, and calculations, we will examine whether the net effect is a taking.

### 1. *Esso*

DACO concluded that Esso would receive an 11.9% return under a 13 cent gross margin. In determining what constituted a reasonable yield on assets, DACO used as a benchmark the average annual return of electric utilities. DACO found that the risks involved in the gasoline wholesale business were only slightly greater than those associated with investing in electric utilities; thus, DACO decided that a reasonable return on assets for gasoline wholesaling should be only marginally greater than the return on electric utilities. Finding that electric utilities received an average return on assets of 10.1%,[33] DACO concluded that efficient gasoline wholesalers should be allowed a return of one to two points higher than 10.1%. Because Esso is able to achieve an annual return on assets that is more than 1.5 percentage points higher than the average for electric utilities, DACO argues that the 13 cent margin is adequate with respect to Esso.

Esso attacks the resultant return on three grounds. First, Esso argues that electric utilities are not an appropriate benchmark because they are public utilities with an ensured customer base whereas gasoline wholesalers have to compete in an open market. *See, e.g.,* Esso Brief, Exhibit G (Declaration of Joseph P. Kalt). While it is true that most electric utilities enjoy a monopoly, this by itself does not mean that investments in utilities are significantly less risky than in the gasoline wholesale business. Indeed, the record contains undisputed evidence supporting the conclusion that gasoline wholesaling in Puerto Rico is not much riskier than utilities.[34] Esso and the other major wholesalers have enjoyed stable market shares since 1981. *See* Esso Brief, Exhibit H. Their costs have been steady while their volume of sales has steadily increased. Esso Brief, Exhibit H. Moreover, Esso, like the other majors, has what amounts to an ensured customer base due to the fact that it owns around 175 retail stations and has long term supply contracts with 125 more. Furthermore, while Esso argues that the wholesaling business is inherently risky due to possible swings in tax rates and

---

**33.** *See* "Regulatory Research Associates, Inc.," *Electric Utility Duality Measures* 25 (Sept. 27, 1989).

**34.** DACO tacitly concedes that gasoline wholesaling is *slightly* more risky than electric utilities in that it ultimately finds that rate of return for the former should be one to two percentage points higher than the latter.

world oil prices, *see, e.g.*, Esso Brief, Exhibit G (Declaration of Joseph P. Kalt), we note that under the gross margin system wholesalers automatically recoup acquisition costs plus taxes. In short, the record shows that DACO's decision to set returns at one or two percentage points higher than those of electric utilities—reflecting slightly *more* risk in the wholesaling industry—is not by itself objectionable.

Esso next disputes DACO's use of the 10.1% figure in describing electric service companies' average return on assets. DACO obtained this figure from "Regulatory Research Associates, Inc.," *Electric Utility Duality Measures*, 25 (Sept. 27, 1989). Esso objects that the 10.1% figure does not appear on the cited page. But DACO points out that it arrived at this figure by dividing figures that *were* reported therein: the utilities' after-tax income by two alternative measures of total assets. *See* DACO Brief at 67 n. 59. Thus, the court finds no genuine dispute that the 10.1% figure properly reflects the average return on assets currently being earned by public utilities.

Esso's final argument is that its parent company, which supplies it with capital, requires a 14% return on investment; therefore, according to Esso, anything less than a 14% return on equity would jeopardize its financial integrity. This argument, however, requires a comparison of apples to oranges. Under the Final Order, Esso is able to achieve an 11.9% return on overall *assets*. How much it or any company earns on common *equity* depends on how it chooses to capitalize its operations. In the case at hand, Esso and the other wholesalers in Puerto Rico finance their operations almost entirely by common equity, with very little debt. Therefore, Esso's return on equity is only slightly higher than its return on overall assets. DACO, however, argues that under a hypothetical 50/50 debt to equity ratio, Esso could easily receive more than a 18% return on equity, *see*

DACO's Cost and Investment Analysis of Esso, and that Esso's desired 14% return on equity could be achieved with a somewhat less drastic restructuring of its financing.[35]

There is support for DACO's position in that it is entitled to insist on a hypothetical capital structure in determining Esso's annual return. In *Communications Satellite Corp. v. F.C.C.*, 611 F.2d 883, 902–09 (D.C.Cir.1977), and cases cited therein, the court held that the F.C.C. did not err in insisting on a hypothetical 45/55 debt to equity structure in a case involving a utility financed entirely by equity. The court found that the agency had an obligation to protect the public from unnecessarily expensive capital structures such as that which occurs when a company is financed entirely by equity with little or no (less expensive) debt. The court noted that

> the FCC cannot be faulted for considering consumer interests in the COMSAT proceeding, and deciding that COMSAT could reasonably have levered its capital structure with debt. In so doing, it not only was true to its statutory obligation, but was also following a practice quite commonplace among public commissions charged with reviewing and setting reasonable rates for service. The practice of imputing a hypothetical amount of debt has been explicitly approved by the public utility commissions or courts of at least twenty states and the District of Columbia.

*Id.* at 904.

Even accepting as true Esso's claim that it requires a 14% return on *equity* to continue attracting capital, Esso has failed to proffer any reason why it could not earn this amount under the a 13 cent margin by altering its capital base. (We note that Esso could earn 14% on less than 50% debt financing; thus, it could still maintain a more conservative ratio than the 50/50 ratio proposed by DACO.) Additionally, Esso

**35.** Along this same line is Esso's claim that DACO should use the figure used by the Federal Energy Regulatory Commission (FERC) as its current yield rate limit—12.43%—rather than the 10.1% figure in setting a benchmark based on utilities' earnings. The FERC figure reflects a return on investor's equity rather than on overall assets. DACO argues that Esso could earn 12.43% and more on common equity by restructuring its capitalization.

can continue to improve its earnings by increasing its volume and efficiency. In short, the undisputed material evidence submitted to this court fails to indicate that Esso will invariably lose its financial integrity and its ability to attract capital as a result of a 13 cent margin.

### 2. *Texaco*

■ According to DACO's calculations, Texaco earns a 12.94% after tax return on assets under a 13 cent margin—the highest of the three plaintiffs in this case. Texaco apparently does not argue that this return would be unjust or unreasonable. Rather, Texaco relies on its arguments that the overall *industry* average is not just and reasonable.

With regard to the first argument, we note that Texaco is mistaken in its belief that DACO allows only a 10.8% for the entire wholesaling industry on average. The 10.8% figure, rather, corresponds to the average of the four high cost majors and not to the industry as a whole, which undoubtedly has a higher average return once the earnings of the more efficient independents are averaged in. More importantly, although Texaco is correct that the issue here is the effect on the industry, the court fails to see how Texaco has standing to complain about the industry average so long as the Final Order has not had a confiscatory effect on Texaco itself. *Cf. Simon v. Eastern Kentucky Welfare Rights Org.*, 426 U.S. 26, 40, 96 S.Ct. 1917, 1925, 48 L.Ed.2d 450 (1976). In other words, if Texaco in fact earns a 12.94 return on assets under a 13 cent margin, and if this return does not jeopardize its financial integrity and its ability to attract capital, Texaco simply has no cause of action under the takings clause. *Duquesne,* 109 S.Ct. 609; *Hope Natural Gas,* 320 U.S. 591, 64 S.Ct. 281 (1944); *Tenoco,* 876 F.2d 1013 (1st Cir.1989). It is a necessary, though not sufficient condition of one complaining of a taking on the basis of a price regulation that one is personally in the class of those regulated who will actually suffer the kind of harm against which the takings clause protects. (It is necessary though not sufficient in the sense that in

*market* price regulation, a just and reasonable rate for the industry may still severely impact individual providers without amounting to a taking.)

### 3. *Shell*

■ Shell's expected rate of return on assets causes us the most concern. At DACO's figure of 5.2% return on net assets, we can see that the effect on Shell may be extremely serious (assuming that in the absence of regulation the "free market" would allow Shell to price its product high enough and still maintain sufficient sales to increase overall profit). If Shell were a public utility that was the sole provider of a given public service, we might be less willing to allow the regulation to stand given this rate of return.

In this case, however, Shell is only one part of an entire industry. If we exclude Shell from the calculus, at the current regulated rate of a 13 cent margin, the general yield for the other three companies of the big four would fluctuate between 11.9 and 15.3 percent. Excluding Shell and assuming a debt to capital ratio of 50/50 (*see* discussion, *supra*), *the yield would fluctuate between 18.2 percent and 24.75 percent* for the three other major wholesalers. As explained earlier, the yield for the small wholesalers is even higher.

We see, therefore, an industry in which most operators make a return on investment solidly within the range of what can be expected for the industry, and one operator, Shell, earns a rate of return which, while undoubtedly low for the wholesaling gasoline industry, at least allows some profit.

### 4. *Investor's Expectations*

■ One of the specific criterion for takings cases as set out in *Connolly,* 475 U.S. at 224, 106 S.Ct. at 1025, is the degree to which the regulation interferes with distinct investment backed expectations. *Id.* at 225, 106 S.Ct. at 1026. The current regulation is by no means the first in this industry. Federal regulation limited the wholesaler profit margin to 8.6 cents from 1973 until 1981. Puerto Rico's own regulations starting in 1985 regulated the margin at various rates from 3.6 to 8.6 cents per

gallon. Indeed, the wholesalers themselves point to the high likelihood regulation as one of the major aspects of gasoline wholesaling investment which tends to increase its risk in the minds of investors. In would be impossible, therefore, to find that the current regulation interferes with investments in a way that was anything but wholly foreseeable. Those who chose to invest in this market are or should be fully aware that price regulation is a part of the investment climate.

### 5. *Right to Withdraw or Seek Exemption*

■■■ In *Permian* the Supreme Court hinted that "if maximum rates are jointly determined for a group or area, the members of the regulated class must, under the Constitution, be proffered opportunities either to withdraw from the regulated activity or to seek special relief from the group rates." *Permian*, 390 U.S. at 770, 88 S.Ct. at 1361; *See Bowles*, 321 U.S. at 517–18, 64 S.Ct. at 648–49. In *Permian*, that Court found that it did not need to hold that such options were constitutionally required since the regulation in question provided adequately for such contingencies. We find that this regulation does the same.

As to the provision in the regulation for a procedure to plead for individual relief, *Permian* is almost directly on point for the facts before us. In *Permian*, the regulation of all producers of natural gas contained general provisions for particularly aggrieved parties to seek an exemption. The Court of Appeals had found the vagueness of the special relief provision to render it insufficient. The Supreme Court reversed, saying that:

> [i]t would doubtless be desirable if the Commission provided, as quickly as may be prudent, a more precise summary of its conditions for special relief, but it was not obligated to delay area regulation until such guidelines could be properly drawn. The Commission quite reasonably believed that the terms of any exceptional relief should be developed as its experience with area regulation lengthens.

*Permian*, 390 U.S. at 771–72, 88 S.Ct. at 1362–63.

Similarly, DACO's regulations, starting at page 63 (original version) allows for petitioning for special adjustments. As was the case in *Permian*, the procedures or standards for such a petition are not developed, but, following *Permian* we do not find that to be fatal.

As to the ability to withdraw, Shell points to a wartime statute of Puerto Rico (Act 228 of May 12, 1942, 23 L.P.R.A. §§ 731–746), which gives the government the power to force merchants to sell staple goods affected by price control, rather than allowing the merchant simply to withdraw the goods from the market. That such a law exists (but is not currently being used against Shell or any other gasoline wholesaler) is not sufficient to amount to a current restriction on market withdrawal. In *Permian*, the statute being challenged provided that no natural gas company could abandon its facilities without obtaining consent of the regulating commission. 15 U.S.C. § 717f(b). The mere fact that the commission *could* grant permission to exit the market satisfied the Supreme Court that the withdrawal provisions of the law were sufficient. *Permian*, 390 U.S. at 770–73, 88 S.Ct. at 1361–63. The untapped power of the Puerto Rico statute governing the forced sale of staple goods is much less of a restriction to withdrawal than existed in *Permian*.

Shell also argues that as a practical and financial matter, withdrawal would be enormously costly, and that DACO's suggestion that Shell withdraw is irresponsible. Both of these contentions may be true. Surely the cost for Shell to leave Puerto Rico would be tremendous, and the shock waves to the industry, and the general economy of the island (including loss of employment by Shell, loss of Shell's yearly expenditures for island goods and services, loss of tax receipts, and other benefits) is potentially enormous. Unfortunately for Shell's current position before this court, however, the wisdom of DACO's *policy* decisions is not before us. That DACO's policy might later prove to be misguided, that it may

prove more detrimental than beneficial to the consumer is a matter for the polling place, not the bench. *Permian* teaches that the regulatory agency may so stringently limit profits that individual providers, even those with major capital investment for whom abandonment may be costly, may be forced to choose abandonment rather than remain in the regulated industry.

### IV. *Conclusion*

We therefore conclude that no material and genuine issues of fact exist for trial. On the facts as presented, we hold that the restriction of profit margin of wholesalers of gasoline in Puerto Rico to 13 cents per gallon is constitutional under both the due process and taking without just compensation clauses of the United States Constitution. After evaluating the method and valuations used by DACO, examining the overall effects on the industry, the effects on the individual companies, the nature of the regulation, weighing reasonable investor expectations, and in light of the history of regulation in this industry, we find that DACO's regulation, while imperfect, falls within a constitutionally permissible range of just and reasonable. While we agree that the regulation will burden Shell most heavily, as the highest cost producer, we do not believe that we are constitutionally compelled on these facts to invalidate the regulation due to its effect on Shell. We are convinced that DACO's profit margin of 13 cents will provide a "just and reasonable" return for the wholesalers of gasoline in Puerto Rico, as those terms are understood under constitutional analysis. We find that Shell will make at least some profitable return on its investment, and that it can avail itself of either a petition for individual relief to DACO based on its first year of operation under the December 1989 regulation, or it can restrict its activities as it sees fit. Since one of the bases for our decision today rests, as did the Supreme Court's ruling in *Permian*, on the promise in the regulation of a review of special circumstances which would evolve

as the agency gained experience with the new regulation, we expect that DACO will treat any such petition with the dispatch and seriousness that this situation deserves.

We urge DACO to be mindful that judicial review of any decision to delay or deny special relief, or to fail to reevaluate the industry-wide effect of its regulation over time might properly lie before this court. Although today it has barely survived a broadside attack on its regulation, we remind DACO that we see vigorous enforcement of the right of special review, and an evolving price structure based on industry experience, as integral elements in our holding of constitutionality. While the doctrine of constitutional review of price regulation leaves enormous power and discretion in the hands of the regulatory agency, that power is not absolute. We note the skepticism with which the First Circuit viewed DACO's 1986 interim regulations in *Tenoco Oil Co. v. Department of Consumer Affairs*, 876 F.2d 1013, 1024 (1st Cir. 1989), and the inherent warning that can be found there. (Since the court found the matter not yet ripe for review, however, it did not need to fully address the adequacy of DACO's regulations at that time). This court and the people of Puerto Rico are well aware of the politically convenient (and potentially disastrous) combination of high excise taxes [36] combined with stringent profit regulation that has become governmental policy. (*See Isla Petroleum Corp. v. Dept. of Consumer Affairs*, 640 F.Supp. 474, 515 (D.P.R.1986) (Appendices I & II). Keen observers are not blind to the chicanery of a policy which boasts of increased governmental tax revenue, expects lower prices for the consumer, and admits of no ultimate cost to the economy. Like a fad diet, the government bills its policy as "effective, painless and safe." Citizens, as well as industry sectors, can see full well the potentially nefarious consequences of DACO's continuing grip on the local gasoline industry, in order to keep the cost of

---

**36.** Compared to the various state gasoline excise taxes as paid at the pump, Puerto Rico's rate, at 30 cents per gallon, is by far the highest. (Comparison to the state motor fuel rates by the Federation of Tax Administrators and the American Petroleum Institute).

gasoline at politically-expedient levels. Gasoline is an essential commodity for Puerto Rico, and the Executive has a duty not to destroy the market through which it is supplied. The dereliction of that duty, if taken far enough, will tread on the constitutionally-protected rights which have been discussed above, and courts will have no alternative but to intervene. Today, constitutional strictures constrain our intervention. We can only hope that the consumers whose interests DACO is charged with protecting will not be the victims of a policy motivated by political shortsightedness.

### V. *Summary of Disposition*

Under the standards set out above, we hold that DACO's motions for summary judgment as to all three plaintiffs on the issue of a due process violation are GRANTED. The motions for summary judgment on the issue of due process made by the plaintiffs are DENIED. DACO's motions for summary judgment on the takings clause issue as to all three plaintiffs are GRANTED. The motions for summary judgment by the plaintiffs on the takings clause issue are DENIED.

Judgment shall be entered dismissing the complaints in the three consolidated cases.

IT IS SO ORDERED.